1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| United States of America, | ) | No. CR-14-01059-TUC-RCC (BGM) |
| | ) | |
| Plaintiff, | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| vs. | ) | |
| | ) | |
| Gabriel Urbalejo, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Currently pending before the Court is Defendant Gabriel Urbalejo's Motion to Suppress Evidence (Doc. 30) and Motion to Suppress Statements (Doc. 31). Defendant is charged with one count of knowingly and intentionally combining, conspiring, confederating and agreeing together with other persons known and unknown, to possess with intent to distribute fifty (50) kilograms or more of marijuana, a Schedule I controlled substance in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C). Indictment (Doc. 17). Defendant is also charged with one count of knowingly and intentionally possessing with intent to distribute fifty (50) kilograms or more of marijuana, a Schedule I controlled substance; in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C). *Id.* Defendant seeks suppression of evidence obtained as a result of a stop allegedly made without probable cause, and seeks suppression of any statements made as violative of Defendant's *Miranda* rights. The Government argues that probable cause existed for Defendant's arrest, and any statement made prior to Defendant receiving a *Miranda* warning will not be used in its case in chief.

Pursuant to LRCrim. 5.1, this matter came before Magistrate Judge Macdonald for an

1   evidentiary hearing and a report and recommendation. On November 17, 2014 oral argument

2   was heard by Magistrate Judge Macdonald and the matter taken under advisement. *See*

3   Minute Entry 11/17/2014 (Doc. 67).  The Magistrate Judge recommends that the District

4   Court, after its independent review, deny Defendant's motion.

5

6   **I.      FACTUAL BACKGROUND**

7           Shortly after 4:00 a.m. on May 24, 2014, United States Border Patrol Agent Daniel

8   Schreckengost received a radio alert from Agent Joshua Taylor, who was operating one of

9   the surveillance cameras in Nogales, Arizona.  Hr'g Tr. 11/17/2014 (Doc. 77) 12:6-13:4.

10  Agent Schreckengost has been a Border Patrol agent for six (6) years. *Id.* at 12:9-10.  He is

11  currently assigned to the intel office in Nogales, Arizona. *Id.* at 12:11-15.  At the time of the

12  May 24, 2014 incident, Agent Schreckengost was assigned to the regular patrol unit. *Id.* at

13  12:16-18.  On the morning in question, Agent Schreckengost was assigned to patrol the west

14  side of Nogales, in an area in and around Potrero Canyon and Meadow Hills. *Id.* at 12:19-23.

15          Agent Schreckengost testified that the radio call he received from Agent Taylor

16  reported an ultralight flying over Mi Casa Canyon.[1]  Hr'g Tr. 11/17/2014 (Doc. 77) 13:5-7.

17  Agent Schreckengost further testified that he responded that he was en route and began

18  driving toward Mi Casa Canyon. *Id.* at 13:11-14.   Agent Schreckengost testified that

19  ultralights are used to transport narcotics from Mexico into the United States. *Id.* at 14:9-15.

20          Agent Schreckengost described the area around Mi Casa Canyon and where it

21  intersects with Al Harrison Road and Coronado Elementary. *Id.* at 16:4-18:23.   Agent

22  Schreckengost testified that when he received the radio alert regarding the ultralight, he was

23  in the area of Meadow Hills.  Hr'g Tr. 11/17/2014 (Doc. 77) at 18:24-19:6.   Agent

24  Schreckengost further testified that upon receiving the alert, he drove down Country Club

25  Road and then drove south on West Frontage to North Al Harrison Road in the direction of

26

27          [1]Agent Schreckengost described an ultralight as a hang glider with a propeller and
    motor attached to it, like a small aircraft, operated by a single pilot.  Hr'g Tr. 11/17/2014
28  (Doc. 77) at 13:19-14:4.

1    the elementary school. *Id.* Agent Schreckengost testified that as he approached the school,

2    he observed a flashlight off to his left, in the bushes on the side of the road, moving back and

3    forth erratically. *Id.* at 19:7-13. Agent Schreckengost also testified that he rolled his window

4    down and turned on his flashlight to illuminate the area, and saw two subjects. *Id.* at 19:16-

5    23, 25:21-26:15. Agent Schreckengost testified that he drove a bit further, and turned left

6    onto a dirt road just above the entrance to the school. *Id.* at 19:24-20:9.  Agent

7    Schreckengost further testified that upon turning onto the dirt road, he observed a silver,

8    older model F-150 pickup, with a metal cage laying on the ground next to it, containing what

9    he believed to be narcotics, and two male subjects, wearing dark clothing, running uphill

10   away from the truck. *Id.* at 20:10-20, 21:13-16, 25:17-20.

11          Agent Schreckengost testified that the bundles in the cage were consistent with what

12   is dropped from ultralights in the Nogales area. Hr'g. Tr. 11/17/2014 (Doc. 77) 21:8-12.

13   Agent Schreckengost further testified that he got out of his vehicle and approached the F-

14   150, at which point he saw one of the subjects had his hands up and was returning to the

15   scene. *Id.* at 22:17-25, 33:16-34:3. Agent Schreckengost also testified that upon observing

16   the subject coming toward him, he began giving commands to physically detain him. *Id.*

17   Agent Schreckengost testified that this individual was later identified as Luis Alberto

18   Borbon. *Id.* at 22:26-23:1. Agent Schreckengost further testified that the other subject

19   continued running up the hill, and he lost sight of him, which he reported over the radio along

20   with information regarding the items found at the scene. *Id.* at 23:2-7, 37:13-26. Agent

21   Schreckengost also testified that he ran a registration check on the vehicle, and it was

22   registered to Defendant Borbon. Hr'g Tr. 11/17/2014 (Doc. 77) at 32:20-25, 35:14-20.

23          Officer Gaston Ortega of the Nogales Police Department testified that he was working

24   the graveyard shift from 10:00 p.m. to 6:00 a.m. on May 24, 2014. *Id.* at 39:14-40:11.

25   Officer Ortega is a patrolman, employed by the Nogales Police Department for nine (9)

26   years. *Id.* 39:17-24. Officer Ortega testified that at approximately 4:00 a.m., on the morning

27   in question, he was with Officers Escobar and Sullivan taking a coffee break outside of the

28   Circle K off West Mariposa Road. *Id.* at 40:12-21. Officer Ortega further testified that while

1    they were standing outside, he heard an engine noise like that of a moped or a motorcycle.

2    *Id.* at 40:22-26.  Officer Ortega testified that he and the other officers looked around the

3    parking lot and street without seeing anything, then Officer Ortega used his flashlight to look

4    up in the air, and saw an ultralight flying at low altitude.  Hr'g Tr. 11/17/2014 (Doc. 77) at

5    41:1-5.  Officer Ortega further testified, that upon seeing the ultralight, he called it into his

6    dispatch to find out whether Border Patrol was aware of it.  *Id.* at 41:12-20.  Officer Ortega

7    testified that after he called it in, he and Officer Escobar drove their patrol cars to Frank Reed

8    Road, by the stadium of the Nogales High School, to follow the ultralight.  *Id.* at 41:16-20,

9    42:2-21, 60:12-17.

10           Officer Ortega testified that he drove initially to about where the high school is, and

11   stopped to see if he could see or hear the ultralight, when he could not, he continued to drive

12   up to Mariposa Hills.  Hr'g Tr. 11/17/2014 (Doc. 77) at 42:18-25.  Officer Ortega further

13   testified that he drove up Mariposa Hills in an effort to gain a better vantage point to see the

14   ultralight.  *Id.* at 42:26-43:19.  Officer Ortega drove to where Mariposa Hills comes to a dead

15   end, exited his patrol car, and climbed the small hill at the dead end.  *Id.* at 44:3-21.  Officer

16   Ortega testified that from this vantage point, he heard the ultralight start again, and saw it

17   flying low into the Mi Casa Canyon area.  *Id.* at 45:7-24.  Officer Ortega further testified that

18   the ultralight was carrying large gray bundles, and he eventually lost sight of it, but it

19   appeared to change direction and go down into the canyon heading south.  *Id.* at 45:26-46:13.

20   Shortly after losing visual of the ultralight, Officer Ortega saw a male subject, wearing all

21   black, including a black, long-sleeved shirt with white lettering on the sleeve, and running

22   from the drop area.  Hr'g Tr. 11/17/2014 (Doc. 77) at 47:25-48:6, 51:3-5.  Officer Ortega

23   testified that the male subject was running toward Ciardulli Place, and estimated that he was

24   approximately one hundred yards away.  *Id.* at 50:10-24, 61:23-62:19.  Officer Ortega

25   observed that the male subject was on the telephone, and overheard him say, in Spanish, "[I]t

26   was fucked up; the police got there."  *Id.* at 51:6-52:7, 63:19-25.  Officer Ortega further

27   testified that he eventually lost sight of the subject, because he went behind a hill.  *Id.* at

28   53:4-14.  At that point, Officer Ortega radioed a description of the subject running towards

1   Ciardulli Place, and the got into his patrol vehicle and drove down to Mariposa Hills and up

2   to Ciardulli Place.  *Id.* at 53:15-24.

3       Upon arriving at Ciardulli Place, Officer Ortega exited his patrol car and began

4   looking for the subject.  Hr'g Tr. 11/17/2014 (Doc. 77) at 54:26-55:5.  Officer Ortega

5   testified that he began searching on the left side of Ciardulli Place, but then received

6   information that the subject was on the other side of his patrol car.  *Id.* at 55:3-56:6.  Using

7   his flashlight, Officer Ortega eventually located the subject in a runoff area down from

8   Ciardulli Place.  *Id.* at 56:18-57:12.  When Officer Ortega shined his flashlight on the

9   subject, the subject threw his cell phone down in front of him.  *Id.* at 57:14-17.  Officer

10  Ortega further testified that the subject had all black clothing, with white lettering on the

11  side, and was physically exhausted. *Id.* at 57:23-58:10. Officer Ortega identified the subject

12  as Gabriel Urbalejo.  Hr'g Tr. 11/17/2014 (Doc. 77) at 58:11-16.  Officer Ortega further

13  testified that he had prior contacts with Mr. Urbalejo. *Id.* at 58:17:22. Defendant was placed

14  in handcuffs, and while he was being walked out, Defendant was asked what he was doing

15  in the area.  *Id*. at 58:23-59, 65:20-21.  Defendant replied that he was out exercising for a

16  triathlon.  *Id.* at 59:2-6.  Defendant had not been read his *Miranda* rights.  *Id.* at 59:7-9.

17      On May 24, 2014, United States Border Patrol Agent Joshua William Taylor was

18  working mobile surveillance capable ("MSC") detail.  Hr'g Tr. 11/17/2014 (Doc. 77) 75:23-

19  19.  Agent Taylor has been a border patrol agent for approximately four (4) years.  *Id.* at

20  76:4-5.  He is assigned to the Nogales Station, on the MSC detail.  *Id.* at 76:2-23.  Agent

21  Taylor described his responsibilities as including operating the camera and observing the

22  radar tracks in a mobile unit.  *Id.* at 76:15-77:24.  The system allows for detection of

23  movement of anything on the ground or at certain elevations.  *Id.*  Agent Taylor testified that

24  the camera records its video to a DVR server in the truck.  *Id.* at 78:8-13.

25      On May 24, 2014, Agent Taylor was in the MSC truck, detailed to their Mount

26  Benedict site in the center of Nogales, Arizona.  Hr'g Tr. 11/17/2014 (Doc. 77) at 78:17-

27  79:1.  Agent Taylor testified that an agent made a statement on the radio that he heard an

28  ultralight flying over the City of Nogales, and requested that Agent Taylor scan for it. *Id.* at

1   79:7-13. Agent Taylor scanned the sky for the ultralight, eventually capturing it on video.

2   *Id.* at 79:20-80:2, 81:23-26.

3   The video shows images of the ultralight flying taken by the infrared camera. *Id.* at

4   83:10-84:7. Agent Taylor said that the ultralight was traveling northwest, in the vicinity of

5   Mariposa Road, and then decreased altitude and turned back south. *Id.* at 84:14-85:17. The

6   direction change occurred in the area of the school and north end of Mi Casa Canyon. *Id.* at

7   85:13-17, 86:20-26. The video also shows individuals walking near the ultralight. Hr'g Tr.

8   11/17/2014 (Doc. 77) 88:6–89:13. Agent Taylor also testified that the video shows a subject

9   who appears to be moving up the hill. *Id.* at 90:21-25, 91:10-12, 93:10-94:2. Agent Taylor

10  testified that he requests law enforcement to give a double arm wave, so that he can

11  distinguish who is law enforcement and who are subjects that they are looking for. *Id.* at

12  94:3-16. The subject moving up the hill did not respond to the double arm wave request. *Id.*

13  Agent Taylor further testified that he used the radio to walk the agents on the ground to the

14  last location of where he saw the subject. *Id.* at 95:5-11.

15

16  **II.    ANALYSIS**

17          ***A. Defendant's First Statement***

18  The Supreme Court of the United States requires "that a person questioned by law

19  enforcement officers after being 'taken into custody or otherwise deprived of his freedom of

20  action in any significant way' must first 'be warned that he has a right to remain silent, that

21  any statement he does make may be used as evidence against him, and that he has a right to

22  the presence of an attorney, either retained or appointed.'" *Stansbury v. California*, 511 U.S.

23  318, 322 (1994) (quoting *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)). "An officer's

24  obligation to administer *Miranda* warnings attaches . . . 'only where there has been such a

25  restriction on a person's freedom as to render him "in custody."'" *Stansbury*, 511 U.S. at 322

26  (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)). "Custodial" means taken into

27  custody or otherwise deprived of freedom of action in a significant way. *Miranda v. Arizona*,

28  384 U.S. 436, 444 (1966) ("By custodial interrogation, we mean questioning initiated by law

1  enforcement officers after a person has been taken into custody or deprived of his freedom

2  of action in any significant way.").

3       The Court has defined "custodial interrogation" as "questioning initiated by law

4  enforcement officers after a person has been taken into custody or otherwise deprived of his

5  freedom of action in any significant way." *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct.

6  1602, 1612, 16 L.Ed.2d 694 (1966).  This definition was refined to recognize that

7  "'interrogation' under *Miranda* refers not only to express questioning, but also to any words

8  or actions on the part of the police (other than those normally attendant to arrest and custody)

9  that the police should know are reasonably likely to elicit an incriminating response from the

10  suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297

11  (1980).  As such, "'[i]nterrogation,' as conceptualized in the *Miranda* opinion, must reflect

12  a measure of compulsion above and beyond that inherent in custody itself." *Id.* at 300, 100

13  S.Ct. at 1689.

14       "[S]tatements taken without *Miranda* warnings (though not actually compelled) can

15  be used to impeach a defendant's testimony at trial[.]" *United States v. Patane*, 532 U.S. 630,

16  639, 124 S.Ct. 2620, 159 L.Ed.2d 667 (2004).  Further, "the *Miranda* rule 'does not require

17  that the statements [taken without complying with the rule] and their fruits be discarded as

18  inherently tainted[.]" *Id.* (quoting *Oregon v. Elstad*, 470 U.S. 298, 307, 105 S.Ct. 1285, 84

19  L.Ed.2d 222 (1985)) (alterations in original).

20       Here, the Government indicates that it has no intention of using Defendant's first

21  statement in its case in chief, and argues that as such there is no *Miranda* issue.  Defendant

22  argues that  "the Government will be unable to meet its burden of proof in the instant case

23  and will fail to demonstrate that all statements made by Defendant were voluntarily made."

24  Def.'s Mot. to Suppress Statements (Doc. 31) at 4.  Defendant has notified the Court that he

25  is not seeking suppression of Defendant Urbalejo's second, or post *Miranda*, statement.

26  Def.'s Not. to Ct. (Doc. 78) at 1.  Although Defendant Urbalejo was in custody, there is no

27  evidence that his initial statement was compelled or coerced or that his will was overborne.

28  Furthermore, even though Defendant's initial statement regarding training for a triathlon was

1   the result of questioning without *Miranda* warnings, the fruits of this initial statement are not
2   tainted, and need not be suppressed.   *Patane*, 532 U.S. at 639.   As such, Defendant
3   Urbalejo's first statement is admissible for impeachment purposes, and Defendant's Motion
4   to Suppress Statements (Doc. 31) is denied.

5               **B.     Suppression of Evidence**

6               For the police, and in this case border agents, to make a warrantless arrest of an
7   individual, they must have probable cause.   *United States v. Hernandez*, 322 F.3d 592, 596
8   (9th Cir. 2003).   "Probable cause exists if, under the totality of the circumstances known to
9   the arresting officers, a prudent person would have concluded that there was a fair probability
10  that the individual had committed a crime."   *Id.* (citations omitted); *see also United States*
11  *v. Ocampo*, 937 F.2d 485, 490 (9th Cir. 1991) (reiterating the rule that a probable cause
12  determination requires a totality of the circumstances approach).   The test for probable cause
13  is an objective test.   *Terry v. Ohio*, 392 U.S. 1, 21-2, 88 S.Ct. 1868 (1968).   Further, in
14  determining whether an arrest complies with the Fourth Amendment, the collective
15  knowledge of all the officers involved must be considered when evaluating these
16  circumstances. *United States v. Ramirez*, 473 F.3d 1026, 1032 (9th Cir. 2007).   This holds
17  true "even if some of the information known to other officers is not communicated to the
18  arresting officer."   *United States v. Butler*, 74 F.3d 916, 921 (9th Cir. 1996) (citations
19  omitted).

20              The Court finds the agents and Officer Ortega's testimony credible, and under the
21  totality of the circumstances, the officers had probable cause to arrest Defendant Urbalejo.
22  The ultralight was observed initially by Agent Taylor in the MSC unit, and by Officer Ortega
23  on the ground.   Hr'g Tr. 11/17/2014 (Doc. 77) at 41:1-5, 79:20-80:2, 81:23-26.   Agent
24  Schreckengost was then alerted by Agent Taylor and followed the ultralight toward Mi Casa
25  Canyon.   *Id.* at 13:5-7, 20:10-20, 21:13-16, 25:17-20.   Agent Taylor and Officer Ortega
26  described the ultralight having a similar flight pattern. *Id.* at 45:7-46:13, 84:14-85:17.   Agent
27  Schreckengost observed two individuals in the vicinity of the Ford F-150, both initially
28  running away from him, until Defendant Borbon returned with his hands up. *Id.* at 20:10-20,

21:13-16, 22:17-25, 25:17-20, 33:16-34:3.  Officer Ortega observed an individual dressed in all black, with white lettering running from the drop area.  *Id.* at 47:25-48:6, 51:3-5.  This same individual was found in the runoff area below Ciardulli Place.  Hr'g Tr. 11/17/2014 (Doc. 77) at 56:18-57:12, 57:23-58:10.  Based upon the totality of the circumstances, "a prudent person would have concluded that there was a fair probability that the individual had committed a crime."  *United States v. Hernandez*, 322 F.3d 592, 596 (9th Cir. 2003). Accordingly, the agents had probable cause to arrest Defendant Urbalejo, and his Motion to Suppress Evidence (Doc. 30) is denied.

## III.  CONCLUSION

Based upon the totality of the circumstances, the agents had probable cause to arrest Defendant Urbalejo.  Additionally, although his initial statement regarding training for a triathlon was the result of a question without *Miranda* warnings, the fruits thereof are not tainted, and should not be suppressed.

## IV.  RECOMMENDATION

For the foregoing reasons, the Magistrate Judge recommends that the District Court DENY Defendant Gabriel Urbalejo's Motion to Suppress Evidence (Doc. 30) and DENY his Motion to Suppress Statements (Doc. 31).

Pursuant to 28 U.S.C. §636(b) and Rule 59(b)(2) of the Federal Rules of Criminal Procedure, any party may serve and file written objections within fourteen (14) days after being served with a copy of this Report and Recommendation.  No reply shall be filed unless leave is granted from the District Court.  If objections are filed, the parties should use the following case number: **CR-14-1059-TUC-RCC**.

. . .

. . .

. . .

. . .

1    Failure to file timely objections to any factual or legal determination of the

2  Magistrate Judge in accordance with Fed. R. Crim. P. 59 may result in waiver of the right

3  of review.

4    DATED this 19th day of December, 2014.

5

6    _____

7    Bruce G. Macdonald
     United States Magistrate Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28